SANDALIO LÓPEZ, Plaintiff and Appellee, *v.* THE AMERICAN
RAILROAD COMPANY OF PORTO RICO, Defendant and Appel-
lant.

No. 6858. Argued January 28, 1936.—Decided May 22, 1936.

1

2

4

*M. Acosta Velarde,* for appellant. *García Méndez & García Méndez* for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the Court.

On October 24, 1932, at a spot where the railroad crosses public highway No. 2 near the town of Aguadilla, there was a collision between a train of the American Railroad Co. of Puerto Rico, travelling from Aguadilla to Isabela, and a truck owned by Angel Cabán Santiago, driven by chauffeur Arturo Vega, travelling from Isabela to Aguadilla. Juan López died as a consequence of injuries suffered in this accident, Angel Cabán Santiago was injured, and his truck was damaged. Sandalio López, father of the deceased and Angel Cabán Santiago, owner of the truck, have brought separate actions against the American Railroad Co. of Puerto Rico to recover damages which they allege having suffered, the former because of the death of his son, and the latter because of the injuries suffered and the damage caused to his truck.

In the lower court, by stipulation of the parties, the evidence presented in the case of Sandalio López as to the manner in which the accident occurred served to decide the case of Angel Cabán Santiago, who also presented oral evidence to show the damages that were caused to him.

It is alleged in the complaint that the accident was due to the negligence of the defendant, and that this negligence consisted in the lowering of the gates at the crossing where the accident occurred after the truck was on the crossing, the said gates falling on top of the truck, in the fact that the train had not blown the whistle, rung the bell, or given any signal of warning whatever since long before reaching the crossing, and in the failure of the gatekeeper to use a flag

to give warning of the approach of the train, as was the custom.

First the defendant moved to strike certain matters from the complaint, and the court denied the motion. Then it demurred to the complaint, and the demurrers were overruled. Finally it filed its answer, denying the essential averments of the complaint and alleging that if there was any fault or negligence on the part of the defendant or its employees in connection with the accident, there was also negligence, which was the proximate and immediate cause of the accident, on the part of Juan López, Angel Cabán Santiago, and the truck driver.

In the action brought by Sandalio López the lower court rendered judgment for the plaintiff, ordering the defendant to pay the plaintiff $1,500 damages, with costs, expenses, and attorney's fees.

In the case of Angel Cabán Santiago the judgment allows the plaintiff the sum of $687.47 for damages, plus costs, expenses, and attorney's fees, the court stating that in due course it would take into account, in fixing the attorney's fees, the fact that there was a single trial for both cases.

Feeling aggrieved, the defendant appealed and assigned 24 errors, which we will now discuss.

The first error refers to the motion to strike which was denied by the trial court.

We will not discuss in detail the allegations sought to be struck. None of them, in our opinion, is prejudicial to the defendant. The complaint alleges that Juan López died as a consequence of the accident; that he was single, 24 years old, with neither legitimate nor natural descendants; and that, inasmuch as his legitimate mother had died before him, "his legitimate father, the plaintiff herein, Sandalio López, is his sole and universal heir, entitled to his estate." The defendant requested the striking of the words appearing between quotation marks. It is argued that this is an action brought in accordance with Section 61 of the Code of

Civil Procedure, which creates a right in favor of the heirs or personal representatives of the deceased, if he was of age; and it is said that since the complaint does not in any way allege that Juan López died intestate, it is clear that the expression "is the sole and universal heir" attempts to supply the allegation of fact that he had not executed a will.

The allegations of the complaint are clear and precise. It is contended that Sandalio López is the sole heir of Juan López; and if the latter died unmarried, after the death of his mother, without leaving legitimate or natural descendants, the only relative entitled to inherit from him must of necessity be the plaintiff Sandalio López, who is 77 years old and his surviving father. This court has held that it is permissible to allege a conclusion of law provided the pleadings show the facts on which the conclusion rests. *Alfaro* v. *Alonso,* 27 P.R.R. 50; *Martínez* v. *Oppenheimer,* 31 P.R.R. 855.

The plaintiff also moved to strike all the allegations intended to establish in advance the lack of contributory negligence on the part of Juan López and Angel Cabán Santiago. Aside from the fact that this does not in any way prejudice the defendant, we do not see how we can prevent a plaintiff from stating in his complaint that he did not negligently contribute to the accident. *González* v. *Malgor, Luiña & Co.;* 29 P.R.R. 97, *Rosado* v. *Ponce Ry. Light Co.,* 20 P.R.R. 528; 45 C. J. 1105. Some courts have gone as far as to require, in these actions based on negligence, an allegation establishing that the plaintiff has not been guilty of contributory negligence. 45 C.J. 1107. Others, the great majority, hold that the plaintiff is not obliged to make such an allegation, and that it is incumbent upon the defendant to prove the said negligence. 45 C.J. 1105. It has not been held, however, that the plaintiff cannot, if he so desires, anticipate said defense. The error assigned must be dismissed.

The rest of the motion to strike refers to certain allegations which the defendant considers mere conclusions

and argumentative matter. It requests, for example, the striking of the following words: "carefully and with every precaution"; "suddenly"; "the defendant's employee performing this act nervously, suddenly, and unexpectedly"; "at high speed"; "carelessly and negligently driven". The allegations sought to be struck are really harmless and, although some of them may be conclusions, and argumentative, the truth is that they do not in any way prejudice the defendant and that the complaints clearly present the theory of the case and the facts on which the plaintiffs rely in support of the actions brought by them.

■■ The second error is based on the demurrers to the complaint, which were overruled. In the case of Sandalio López it is alleged that the complaint does not set up sufficient facts to constitute a cause of action. The defendant, which in its motion to strike requested that the words "is the sole and universal heir" be struck, now argues that the plaintiff must allege and prove that he is such an heir, because the law applicable to these cases is Section 61 of the Code of Civil Procedure and not Sections 1803 and 1804 of the Civil Code. The defendant contends, if we are not mistaken, that in an action for damages based on the sections of the Civil Code cited it is not necessary to prosecute a declaration of heirship, and to present it in evidence, but that it is necessary to do so in the instant case which in its opinion is an action based on Section 61 of the Code of Civil Procedure.

The distinction which the appellant attempts to draw between the provisions of the two codes with respect to the evidence presented lacks importance. The action brought has its origin in Section 1803 of the Civil Code (*Orta* v. *P.R. Ry. Light & Power Co.*, 36 P.R.R. 668); but whatever may be the statutory provisions regulating it, the fact is that the plaintiff has not only shown that he depended for support on his son Juan López, but also that he is his sole and universal heir, as he alleges in the complaint. It has also been shown that the plaintiff Sandalio López, his daughter Julia

8

López, and the deceased lived together, and that the latter, who had no property, died intestate. This evidence has not been refuted by the defendant. The *ex parte* proceeding of a declaration of heirship could not have had a greater probatory force than this testimony, presented in a contentious proceeding in which the party affected by the evidence may use the weapon of cross-examination and offer any other defense he may wish to establish. In the case of *Soriano et al* v. *Rexach et al.,* 23 P.R.R. 531, this court said that oral testimony given at the trial upon the merits of the case has more intrinsic weight and real probative value than the mere certified copy of a decree entered in an *ex parte* proceeding wherein there is no participation whatsoever by an adversely interested party. This probative value, however, is limited in its scope and effect to the defendant in the concrete case involved.

■ The provision of Act no. 9, approved by the Legislature of Puerto Rico on April 5, 1933 (Session Laws, p. 199), to the effect that no district court of Puerto Rico shall admit or take into consideration any petition for declaration of heirs if the petition is not accompanied by a certificate from the Secretary of the Supreme Court of Puerto Rico, in which certificate he states under his signature and official seal, that it does not appear from the records in the said book that the person referred to has executed any will has no application in the instant case which has no relation to a declaration of heirship. This requisite is necessary in the *ex parte* proceeding, where the party interested in the declaration of heirship must produce all available evidence to show to the court that no will has been executed. As we have already said in this case, the persons who lived with Juan López, who had no property, testified that he died without executing a will. The defendant did not present any evidence whatever to refute this showing.

The appellant argues that the evidence shows that Juan López was not single. It bases this contention on a statement

of witness Angel Cabán Santiago, who testified that the said Juan López was going to Aguadilla to see his wife *(señora)*. The defendant deduces from this that the deceased was married. The evidence shows clearly that Juan López did not marry. The plaintiff and witnesses Julia López and Angel Durán state that he was a bachelor. The plaintiff stated that there was a little woman whom his son visited from time to time. Angel Cabán Santiago was probably referring to this little woman when he said that Juan López was going to Aguadilla to see his wife. The defendant did not present any evidence whatever to contradict the evidence of the plaintiff that his son, Juan López, was single.

 In the case of Angel Cabán Santiago the appellant contends that the court erred in overruling the demurrer for misjoinder of actions. The plaintiff claims a sum of money as indemnity for the damages arising from the injuries suffered, and also requests indemnity for the losses suffered because of the damages caused to his truck. These are the two actions which the defendant considers improperly joined. It is argued that the District Court of Aguadilla erred in holding that the law applicable to this case is Act No. 4 of March 30, 1933 (Session Laws, p. 186), which went into effect on June 28, 1933, by virtue of which the causes of action for injury and damages to a person, and to property, arising from the same tort may be joined in the same complaint without the necessity of stating them separately.

The defendant-appellant assumes that the damages caused to the plaintiff and to his truck in the same accident constitute two separate causes of action which cannot be joined under Section 104 of the Code of Civil Procedure before it was amended. We are not certain that this is the best doctrine. The decisions on this point are in conflict. There are some which hold that the damages caused to a person and to his property, arising from the same tort, constitute a single cause of action. *King* v. *Chicago M. & St. P. Ry. Co.*, 80 Minn. 83, 82 N. W. 1113. Others hold the contrary.

*Lamb* v. *Harbaugh,* 105 Cal. 680, 39 P. 56. But assuming that there are two different causes of action and that they could not be joined under the law in force before the amendment was enacted, we are of the opinion that the lower court has not committed the error attributed to it, for the reasons that follow.

The demurrer was filed on June 19, 1933, and overruled on July 12 of the same year. The decision on the demurrer was subsequent to the effective date of Act no. 4, approved in 1933. It is alleged that this act is not retroactive. The appellant admits that it is true that procedural statutes generally have retroactive effect, but it maintains that when one of the parties has acquired a right under the previous system of procedure, such right may not be taken from him by giving retroactive effect to the new act. This question has already been decided by this court. In the case of *Ojeda* v. *Gavilán,* 46 P.R.R. 386, the defendant appeared before a district court to request the vacating of an attachment ordered at the instance of the plaintiff, and subsequently filed a motion for a change of venue to another district court. According to Section 77 of the Code of Civil Procedure in force when the motion to vacate the attachment was filed, the defendant, by virtue of the same had submitted to the jurisdiction of the court where the action was brought. Subsequently the said section was amended in the sense of preventing such an appearance from effecting a submission. This court held that the amendment, since it involved a rule of procedure, was immediately applicable and retroactive, and reversed the decision of the lower court, expressing itself in the following terms:

"The amendment was in force when the motion for change of venue was decided. It is true that it was not in force at the time the vacation of the attachment was requested, but that is unimportant because we are dealing with a rule of procedure, which became immediately applicable, according to the doctrine established in the cases of *Roman Catholic Apostolic Church in Porto Rico* v. *People,* 7 P.R.R.

348; *Cintrón et al.* v. *Banco Territorial y Agrícola,* 15 P.R.R. 495; *Brenes* v. *Hartman & Co.,* 17 P.R.R. 568; and *Arbona Bros.* v. *H. C. Christianson & Co.,* 26 P.R.R. 250.''

According to the opinion of this court, the plaintiff in the case cited did not acquire a right to have the case tried in the district court in which the complaint was filed because of the fact that the defendant had filed a petition to set aside an attachment at a time when this petition was equivalent to a submission to the jurisdiction of the court. The amendment had a retroactive effect and by virtue of its provisions the defendant obtained the change of venue.

In the case of *Howard* v. *Fall River Iron Works Co.,* 203 Mass. 273, 89 N. E. 615, the facts alleged are very similar to those in the present case. The Supreme Court of Massachusetts said the following:

"But the defendant contends that the plaintiff could not recover upon her count at common law; that she had not the right to join a common law count for conscious suffering with a count under the statute for the death of her intestate. This was so before the passage of St. 1906, c. 370. *Brennan* v. *Stardard Oil Co.* 187 Mass. 376. This injury occurred on February 16, 1906; this action was brought on April 7, and the plaintiff's intestate died April 19 of the same year,—before the statute above referred to took effect. The defendant contends that this statute should not be given a retrospective effect, and so that the rule of the Brennan case (187 Mass. 376) should be applied here. But this is a remedial statute, and we have heretofore decided that it applies to actions which were pending at the time of its passage as well as to those which were brought after it had taken effect. *Bartley* v. *Boston & Northern Street Railway,* 198 Mass. 163, 168, and cases cited. It relates merely to the form of procedure by which existing rights are to be enforced. Upon familiar principles it must be applied also to causes of action which had already accrued when the statute was passed."

The error assigned was not committed.

■ The third, fourth, fifth and sixth errors, which we will now discuss jointly, are assigned as follows:

"Third: The District Court of Aguadilla committed manifest error in holding that the appellant had provided and maintained, on

the date of the accident, a flagman to warn the public of the approach of its engines and trains to the crossing where the accident took place.

"Fourth: The District Court of Aguadilla erred in holding that it was the custom of the defendant to manipulate signal flags to announce the danger of the approach of its engines and trains to the crossing where the accident took place.'

"Fifth: The District Court of Aguadilla erred in holding that it was the custom of the employee in charge of the gates to station himself next to the crossing and the signal flags.

"Sixth: The District Court of Aguadilla committed manifest error in rendering judgment in this case on the ground that the flag announcing the approach of the train had not been put in place.''

The appellant extracts the conclusions relating to the signal flag from the opinion of the lower court, for the purposes of discussion and rebuttal. Let us now copy the entire paragraph wherein the trial court establishes this and other conclusions of fact on which it based its decision:

"The court, upon the evidence presented by both parties, considers the following essential facts proved: That on October 24, 1932, at about 2:45 in the afternoon, Juan López, from whom the plaintiff derives his rights, was travelling in Ford truck C. P. 233, owned by Angel Cabán Santiago and driven by chauffeur Arturo Vega, from Isabela to Aguadilla, said truck being loaded with 24 bags of rice; that upon approaching a railroad crossing which is located on highway no. 2, between Isabela and Aguadilla, at kilometer 140, hectometer 5, a passenger train belonging to the defendant American Railroad Company collided with the said truck, causing the death of the said Juan López; that at the said crossing the defendant company had provided and maintained, in the date of the accident, a system of crossing gates and a gatekeeper and flagman to warn the public of the approach of its engines and trains, the custom there always having been to close the crossing by lowering the gates and manipulating the signal flag to announce the danger, all of which was done a few moments before the arrival of the trains and engines of the defendant to the said crossing, it being also the custom of the employee in charge of the gates and flag to place herself next to the crossing and the signal flag, and that the trains, before reaching the said crossing, blew their whistles and rang their bells to announce their approach; that as the truck in which the plaintiff's son was travelling descended,

the driver slowed down the truck an almost stopped it upon approaching the crossing and tried to find out whether or not any train was coming, not having seen or heard any train, or sign of its proximity, because no whistle or other alarm signal was sounded, and because the flag announcing the approach of the train had not been put in place and the gates had not been lowered by the gate keeper; that the truck went on its way down the hill and was about to cross the railroad tracks just as the gatekeeper suddenly attempted to put down, and did put down some of the bars, when it was no longer possible to stop the truck (although she did not put up the flag), the bars striking the truck in which the plaintiff's son was travelling at the same time that a passenger train appeared, going toward San Juan, which train collided with the truck in question, causing as has already been said, the death of the said Juan López; that the truck was driven carefully and diligently, and that the only cause of the said accident was the fault, carelessness, and negligence of the employees of the defendant who were then and there acting as such employees, the death of Juan López being the sole and proximate result of said collision.''

The findings of the court as to the signal flag are not the basis of the judgment appealed from. The court *a quo* rests on several grounds which, even discarding the question of the flag, are sufficient to support its decision. The appellant maintains that the statements of the trial court with regard to the custom of handling the flag are not sustained by even the remotest trace of evidence. We shall set out the evidence which, in our opinion, led the lower court to find as it did. The defendant's witness Adolfo Hernández testified that he heard Andrea González cry: ''Stop, stop;'' that he then stopped to see what was happening, and that she had a red flag in her hand and was saying that to the truck with that flag. Andrea González, the gatekeeper of the company testified that when she saw the truck she saw that it was taking no precautions to stop and she signaled to it with a flag; that she made the signals right from the gate controls; that signal flag was red and there was another green one; that the truck was going neither very fast nor very slowly; that she signaled with a flag and in addition cried out: ''Stop,

stop, the train will hit you''; that the truck was travelling at a moderate rate of speed; that she had seen other cars traveling fast, but that that one, referring to the truck involved in the accident, was not one of those which were travelling very fast, that it was coming moderately; that it was then that she was down signalling with a red flag in her hand; that she signaled it with the flag; that she began to signal the truck because she saw that it was not ready to stop; that she signals when it is necessary; that when she sees that they are going to stop she does not have to cry out or signal. The defendant's witness Eduardo Ramos testified that he heard cries and looked toward the highway and saw the gatekeeper with a flag which she was waving from side to side while saying: "Stop, stop", and then he heard the collision and went to the spot.

We will not say that the lower court was rigorously exact in weighing the testimony of the witnesses for the defendant in respect to the flag and the signals, but we do believe that its findings are not entirely devoid of evidence to support them. As we said before, the lower court rests on other grounds which are sufficient to support its decision.

The appellant alleges that no law exists in Puerto Rico requiring the use of a signal flag where a railroad crosses a public highway, and that Act No. 70 of 1917 ((11) p. 433), which determines the duties and rights of the railroads at these crossings, is silent on this point. It is true that the said act does not require the said precaution; but we would not dare to say categorically that the company is relieved of the duty of adopting this precaution in all cases and under all circumstances. Everything depends on the nature of the crossing and on the custom established by the railroad company. The crossing may be of such a nature as to require the presence of a person charged with announcing the proximity of the train by means of a signal flag. The placing of gates at a crossing necessarily requires the presence of a person to handle them for the purpose of stopping traffic

when the train is approaching. Also, when the company has established the custom of stationing a person at the crossing to give such signals, the failure to observe this custom may constitute an act of negligence under certain circumstances. 52 C.J. 418; *Casey* v. *N. Y. Central & Hudson River Railroad Co.,* 78 N.Y. 518, 16 N. Y. Court of Appeals Rep. 541; *St. Louis S. W. Ry. Co. of Texas* v. *Boyd,* 56 Tex. Civ. Ap. 282, 119 S. W. 1154.

 The seventh error is based on the finding of the lower court that the train did not sound its whistle or bell and that it gave no alarm signal upon approaching the crossing where the accident occurred. The evidence on this point was conflicting. The plaintiff offered his to show that no whistle was blown, no bell rung, nor any signal whatever given; the defendant also produced evidence to show that the whistle was blown or the bell rung. Arturo Vega, driver of the truck, and Angel Cabán Santiago, testified that they heard no whistle, bell, or signal from the train. The defendant argues that these witnesses have an interest in the matter and that they were not in a position to hear a whistle or bell due to the fact that they were inside of the closed cabin of the truck; and that moreover the truck was descending in second gear, with the motor making the consequent noise. Witness Arturo Vega testified that the windows of the car were down and that the windshield was up when the accident occurred. The interest of these witnesses, and others for the defendant, in the outcome of the case is a question for the lower court to decide. They were not, however, the only witnesses for the plaintiff who testified on the point. Witness Mamerto Molinary says that he did not hear a whistle or bell, that the train did not sound its whistle or bell on the day of the accident. Angel Durán, who was in the rear of the truck, testified to the same effect. When this witness was asked whether the train sounded its whistle or bell, he answered: "No sir, nothing"; adding that he heard no other warning signal.

The appellant points out that testimony relative to having heard has more probatory value than testimony of not having heard. The proposition seems acceptable, provided the circumstaces are the same, but, aside from the fact that there were witnesses who positively stated that no whistle was blown or bell rung, this is a question for the lower court to decide in weighing the evidence. In the present case the trial court gave more credit to the evidence of the plaintiff on the point than to that of the defendant. We have carefully studied the evidence, and inasmuch as the conflict arising from the same was decided in favor of the plaintiffs, and it does not appear that the court *a quo* committed manifest error, we do not feel inclined to alter its findings.

The eighth error assigned is based on the statement of the trial court that the testimony of the defendant's witness Pedro Arroyo confirms the fact that the train did not give an alarm signal or warning when it was approaching the crossing. This witness stated: ''Well, I was in the last car and I did not notice whether the train sounded its whistle or bell.'' The testimony of this witness was not the only testimony which was produced as to the omission attributed to the defendant in relation to the sounding of an alarm. As we have already said, some witnesses testified that they did not hear, and others that neither the whistle nor the bell was sounded. The lower court calls attention to the testimony of Pedro Arroyo because he is a witness for the defendant. The error assigned was not committed.

The ninth and tenth assignments allege that the lower court erred in finding that the gates were lowered suddenly when it was no longer possible to stop the truck, and in rendering judgment on the ground that the gates were not lowered by the gatekeeper. The appellant maintains that the testimony of the plaintiff Arturo Vega, the driver of the truck, shows that the barriers were lowered before the truck reached the nearest barriers. This witness says that the gatekeeper ''dropped the gates on him a little before reach-

ing the track, about two or three meters before reaching the track.'' The defendant argues that the gates once lowered, are approximately three meters from the center of the track and two and one-half meters from the rail, and that, according to driver Arturo Vega, the cabin of the truck was about one and one-half meters from its front. After establishing these premises the following question is put: If the gates are two and one-half meters away from the rail, and the truck, according to the driver Arturo Vega, was three or four meters away from the track when the gates were lowered, how is it possible that they could fall on the cabin of the truck which is behind the hood? At one point the witness said that about three or four meters before reaching the track the woman lowered the gates quickly and nervously, and at another he stated that the gatekeeper dropped the gates on him a little before reaching the track, at about two or three meters, and at this distance ''that woman dropped the barriers.'' The gatekeeper may have moved to lower the barriers when the truck was three or four meters, or two or three meters, away from the track, already in the zone between the track and the gates, and as the driver may have moved forward, and the evidence shows that he accelerated to defend himself, it is not strange that the barriers might have fallen on the cabin of the truck. It must be borne in mind that an accident of this sort occurs with unusual swiftness, and causes the consequent excitement, and is not to be expected, nor should it be required, under the circumstances, that a witness fix with mathematical exactitude facts and details which were hastily observed. When these facts thus narrated, could have occurred and developed in the manner expressed by the witness, his degree of credibility should not depend upon a lack of precision in fixing the distance, or on a slight variation in estimating the same. In this case it is very possible that the facts occurred in the manner stated; and that, when the gates began to be lowered, the driver of the truck, which was already very

near, and within or almost within the zone between the rail and the gates, believing that he did not have time to stop, accelerated his speed, as his testimony shows, and that the barriers fell on the cabin of the truck.

The driver stated, in brief: That on October 24, 1932, he was coming from Camuy toward Aguadilla and at about 2:45 he approached the Aguadilla grade crossing, which is located on the Aguadilla hill, on the way up toward the towns of Isabela and Camuy, that is, highway no. 2; that at about 50 meters before reaching the crossing he noticed that the gates were up and continued descending in second gear; that he was coming from Isabela to Aguadilla and that at about 15 meters more or less before reaching the crossing he reduced his speed, looked, and listened, and seeing nothing in the way, went on; that shortly before reaching the tracks about two or three meters away from the track, that woman dropped the gates on him; that upon seeing the gates he was startled and immediately saw the nose of the train which was already at his side; that in speaking of the nose of the train he refers to the front part of the engine; that the train was going to cross the grade crossing going from Aguadilla to Isabela; that the train came from the left of the witness; that when he saw the train so close and the barriers over him, he accelerated the motor to defend himself because it was already on top of him, but still it caught him by the rear wheels dragging him to the right side where the gatepost is located; that the train threw the truck on its right side to the spot where the gate controls are located; and that Angel Cabán Santiago, Juan López and Arturo Vega were injured; that the gates were operated by a woman; that he had not seen her before the accident; that he first realized that the woman was operating the gates when he was almost on the track; that the woman lowered them hurriedly, in such a manner that two of them fell on the cabin of the truck, and the other two stayed up; that the left and the right barriers fell on the cabin, and that one of the two

on the other side was broken when the train threw the truck on the right side; that the witness increased the speed of the truck in order to leave the spot because the train was already close, and in order that it should not strike the cabin; that only two barriers were broken, the one to the left, entering, and on the other side the barrier on the right, that is where the train threw the truck; that when the woman lowered the first two barriers, the other two were not yet in place; that coming down from Isabela to Aguadilla he could see the crossing from a distance of about fifty meters because the arrows, that is, the gates, were up; that he could see them because that part is higher and the crossing is lower; and that the crossing may be seen perfectly about 50 meters away; that in saying that he reduced his speed, looked and listened, he means that he almost stopped the car in order to see if there was any danger and as he saw none, he went on down; that when he was about three or four meters away from the track the woman lowered the gates quickly and nervously, and that then he saw that the gates were falling on him and he saw the nose of the train almost on top of the truck, for which reason he accelerated the motor to defend himself; that before this moment he had not noticed the approach of the train, nor heard a whistle, bell or any other noise or alarm; that the train was climbing fast; that the train was going so fast that in throwing them it passed the entire crosing; that the train was a passenger train, engine no. 64, and that José Gallardo was the engineer that day; that Angel Cabán Santiago owner of the truck Angel Durán, a laborer on the truck, and Juan López, who died as a consequence of the injuries received in the collision, were with him that day; that he has passed the crossing at which the accident occurred on other occasions on which other trains have passed; that the custom of the employees of the company was to lower the gates before the arrival of the train; that on October 24 the gates were lowered when the truck was about three or four meters from the track and

the train was facing the crossing; that the nose of the train was almost upon the truck, when the front wheels entered the crossing.

The appellant argues that Arturo Vega should have seen the gatekeeper before passing the crossing, since the latter was visible from a distance of 50 meters. It adds that the circumstance that Arturo Vega did not see the gatekeeper until after the accident shows that it is not true that he observed, saw, or looked, since had he seen and looked, he should have seen the gatekeeper. The witness states that before the accident occurred he did not see the gatekeeper and that he noticed that she was operating the gates when he was almost on the track. This could have happened, considering that, according to the evidence of the plaintiffs, the gates were lowered hurriedly, when the train was already at the crossing, from which evidence it is deduced that the gatekeeper reached the crossing at that moment.

In the opinion of the defendant the fact that the gates were lowered shows that the train whistled or gave some warning. Not necessarily. If the gates were lowered suddenly, at the moment of the approach of the train, when there was no time to avoid the accident, as shown by the evidence of the plaintiff, which was believed by the lower court, it cannot be said that the fact that the gates were lowered is evidence that the train gave timely warning, by means of a whistle, bell, or any other signal, of its approach to the crossing.

The defendant discusses in detail the evidence presented, in a 206-page brief. We cannot stop to point out minutely all of the details scattered through the evidence, because we consider it unnecessary and because we would have to lengthen considerably this opinion, which is already long enough. We will merely say that the testimony of the driver Arturo Vega is corroborated by that of several eye-witnesses offered by the plaintiff.

Several witnesses for the defendant testified that the gates were lowered before the truck arrived at the crossing. The lower court decided the conflict of the evidence in favor of the plaintiffs, and, since it has not been shown that it committed manifest error or was moved by bias, prejudice, or partiality, we must respect the judgment of the trial court.

The appellant argues that the fact that the radiator of the truck and steering rod were damaged shows that there was some collision with the front part of the truck. Pedro González witness for the defendant, who repaired the truck, testified on this point. Later Felipe R. Cuevas expert mechanic and witness for the defendant, testified that according to his experience, in order for the radiator and the steering rod of a car to be damaged there must be an impact at the front. The defendant-appellant infers that this damage was caused when the truck broke the gates, which had been lowered, since the damage could not have been caused in any other way, upon the basis of the description of the accident given by the plaintiff's own witnesses. This evidence, of a circumstancial nature, does not destroy the direct evidence on the point presented by the plaintiff, nor does it constitute a sufficient ground for us to affirm, against the evidence believed and the findings made by the trial court, that the truck broke the gates with the front part of the car. The evidence shows that the truck was dragged by the engine and thrown against the right gate on the far side. It is possible for the radiator to have collided with some object when the accident happened and the truck was dragged. The movement of a truck, upon receiving the impact of a locomotive, under the conditions in which this accident occurred, cannot be easily determined with exactitude. The situation prior to the collision was established, as is deduced from the decision of the lower court, by the testimony of eye-witnesses. The court *a quo* believed the evidence of the plaintiff, and it would not be reasonable for us, on the basis of inferences arising from the condition of the truck after the accident,

to question and discard the testimony of witnesses believed by the trial court, who relate the facts in a manner in which they could well have occurred.

The eleventh error assigned is that the court rendered judgment for the plaintiffs, in spite of the fact that, according to the weight and the preponderance of the evidence, the defendant was not in any way negligent. We have carefully examined the evidence taken and believe we are not in a position to say that the lower court committed the error assigned.

The twelfth error consists in the refusal to admit in evidence the report made by the appellant to the Public Service Commission within three days after the accident. The appellant, at the trial, attempted to present in evidence a carbon copy of a report sent by it to the Public Service Commission, the appellees objected, and after the matter was argued the court refused to admit the document. The report is made in accordance with section *(w)* of Act no. 70 of 1917 (Session Laws (11) p. 432, sec. 3), according to which every public service company must give immediate notice to the Public Service Commission in case of any accident in or about, or in connection with, the operation of its property, etc., within such time and in such manner as the commission shall by general rule or special order or otherwise require. Such report, by express provision of the act, shall not be open for public inspection, except by order of the commission, and shall not be admitted in evidence for any purpose in any suit or action for damages growing out of any matter or thing mentioned in said report.

This provision is sufficient to hold the evidence inadmissible. It is, moreover, a firmly established rule that self-serving statements of a party, whether oral or in writing, are not admissible in evidence in his favor. Such statements are usually made in cases in which the declarant has some interest in presenting the facts as related by him. The element of interest at the time of making the statement

is not essential. The rule has been considered applicable in all its force even where the statement does not involve any interest at the time it is made. 22 C.J. 220–225. The error assigned must be dismissed.

The thirteenth and fourteenth errors assigned are to the effect that the judgment rendered is contrary to the facts and the law, and that the lower court, in conducting the trial, in weighing the evidence, and in rendering its decision, acted with manifest bias, prejudice and partiality. The defendant devotes 50 pages of its brief to the discussion of these supposed errors. We have thoroughly examined the evidence, we have read the brief of the distinguished attorney for the defendant with the attention which it merits, and we do not find that the lower court has committed the errors assigned. It certainly did not act with bias, prejudice and partiality. Its conduct during the trial does not show that it so acted, and its findings in its decision cannot be interpreted in the sense sought by the defendant. The errors assigned must be dismissed.

The fifteenth and sixteenth errors are as follows:

"Fifteenth: The District Court of Aguadilla committed manifest error, in rendering a judgment against the defendant-appellant, in holding that even if the driver of the truck in which the son of plaintiff Sandalio López was travelling had been guilty of contributory negligence, this negl'gence could not be imputed to the deceased.

"Sixteenth: The District Court of Aguadilla committed manifest error in rendering judgment against the defendant-appellant, because according to the weight and preponderance of the evidence, the plaint'ffs were guilty of contributory negligence, which was the proximate and immediate cause of the accident."

Juan López from whom Sandalio López derives his rights, was travelling in the rear of the truck. The general rule, recognized by this court, is that the negligence of the driver of a vehicle cannot be imputed to a passenger in the said vehicle. We so held in *Domínguez* v. *P.R. Light & Power Co.*, 19 P.R.R. 1034, and *García* v. *American R.R. Co. of P.R.*

45 P.R.R. 738. We consider it unnecessary to repeat what we have already said in the opinions delivered in the cases cited. Nor can we assume that the driver was negligent. The lower court, basing itself on the evidence presented finds that the said chauffeur slowed the truck and almost stopped it upon approaching the crossing. The court does not say that the truck stopped completely before approaching the crossing, nor do we consider it necessary under the circumstances of this case. In *Garcia* v. *Am. R.R. Co. of P.R., supra* this court expressed itself as follows:

"In our opinion the *Goodman* case should not be interpreted in the sense of imposing on the driver of a motor vehicle the duty to stop always upon reaching a railroad track. It does not seem reasonable to require invariably, in all cases, that the driver should stop completely before going upon the tracks. The general jurisprudence does not sanction such rule. It has been said by a number of courts that a driver of a motor vehicle who intends to cross the tracks of a railroad must stop, look and listen, at a place from which he can see over the tracks, in order to ascertain whether a train is coming. The prevailing rule, however, is that no such duty is invariably imposed on the traveler as a matter of law. The controverted questions are not always the same, the facts change, and in order to judge the conduct of a driver who has not stopped his vehicle, the circumstances attending his reaching the cross'ng, his ignorance or knowledge of the situation of the track, and the reliance he may have placed on his opportunity for seeing and hearing, in either direction along the track, must be cons'dered. We have heretofore said that each case has its peculiarities, its characteristic features, its special mark, its own physiognomy, and that it would be no easy task to do justice if in order to determine what facts constitute ordinary care or negligence we had to follow fixed and invariable rules. *Rivera* v. *Central Pasto Viejo, Inc.*, 44 P.R.R. 236, 258. To determine whether or not there was negligence in a particular case we must ask ourselves what a reasonably prudent person would have done in similar circumstances. We must not expect from human nature more than what it can humanly give, and it does not seem reasonable to require precautions which are not adopted in the ordinary course of human conduct, no matter how justified they be when there is a special reason for their necessity, in car'ng for our own safety and that of other."

So we said in an opinion delivered on November 28, 1933. The Supreme Court of the United States, in an opinion delivered subsequently, on April 2, 1934, also referring to the *Goodman* case, said among other things, the following:

"There is need at this stage to clear the ground of brushwood that may obscure the point at issue. We do not now inquire into the existence of a duty to stop, disconnected from a duty to get out and reconnoitre. The inquiry, if pursued, would lead us into the thickets of conflicting judgments. Some courts apply what is often spoken of as the Pennsylvania rule, and impose an unyielding duty to stop, as well as to look and listen, no matter how clear the crossing of the tracks on either side. (Citations.) Other courts, the majority, adopt the rule that the traveler must look and listen, but that the existence of a duty to stop depends upon the circumstances, and hence generally, even if not invariably, upon the judgment of the jury. (Citation.) The subject has been less considered in this court, but in none of its opinions is there a suggestion that at any and every crossing the duty to stop is absolute, irrespective of the danger. Not even in *B. & O. R. Co.* v. *Goodman, supra,* which goes farther than the earlier cases, is there support for such a rule. To the contrary, the opinion makes it clear that the duty is conditioned upon the presence of impediments whereby sight and hearing become inadequate for the traveler's protection." *Pokora* v. *Wabash Ry. Co.,* 292 U. S. 98, 102–103.

The Supreme Court goes on to other considerations and states that the opinion in the *Goodman* case has given rise to confusion in the federal courts, having received hesitating support in the state courts, and concludes by saying: "We limit it accordingly."

In the instant case, in which, according to the evidence, there are gates which the railroad company uses when one of its trains nears the crossing, we believe that the driver used reasonable care in reducing his speed and almost stopping, in listening, and looking before crossing the track, as the lower court states in its findings of fact. The errors must be dismissed.

The seventeenth error is based on the fact that the District Court of Aguadilla in the case of Sandalio López, took into consideration, as elements of damages, the moral

and mental anguish of the plaintiff. The appellant admits that in the case of *Orta* v. *P.R. Light & Power Co. supra,* it was held that this is an element which may be considered in fixing the indemnity for damages, but it maintains that in that case the deceased son was a minor, and that the holding of this court is not applicable to this case, where the son was of age. We see no reason whatever which may serve as a ground for distinguishing between the loss of a minor son and that of a son who is of age, when mental anguish is being weighed. We cannot admit that the suffering of a father at the death of his son is affected by the fact that the son is less than 21 years of age. Nor can it be held, as an invariable rule, that when the son is of age the father no longer needs him. According to our Civil Code the legitimate ascendents and descendants are obliged to support each other, and the obligation is demandable from the time the person having a right thereto shall require such support. Sections 142, 143, and 147, Civil Code, 1930 ed.

In this case it has been shown that the plaintiff depended for support on his son Juan López. He testifies that when his son died he had no salary or property; that he did have formerly, but that later his sight was impaired; that he has been blind for seven years and everything is over for him; that when his son died he was living on what the son gave him; that the son gave him two or three dollars every week for his support and the support of the daughter of the witness; that he also gave him shoes, clothing and medicine; that aside from his son he had no one else to support him; aside from the good people who have wished to help him; that since his son died he has suffered a great deal, but that in the town where he lives there are many charitable people, many good people, who have helped him, and he has been able to live.

The eighteenth error assigned is that the lower court, over the objection of the defendant, admitted evidence as to the age and health of the deceased Juan López.

The nineteenth error assigned is the award of $1,500 to Sandalio López. The theory of the defendant-appellant is that "in these cases, in fixing the damages, the shorter life expectancy of the plaintiff should be considered, and not the expectancy of the deceased, who because he was younger than the plaintiff probably had a greater expectancy of life". It is precisely for these reasons that we cannot explain the assignment as error of the admission of evidence which does not prejudice the defendant, when the lower court clearly shows in its decision that it did not take such evidence into consideration, and that it adopted the theory invoked by the defendant. In its opinion the trial court said:

"Now then, taking into account the advanced age of the principal (sic), that is, the plaintiff in this case, and the few wants he has in his accustomed standard of living, the court believes that an award of $1,500 would be just, reasonable and adequate."

We wish to make clear that we are not holding that the evidence is inadmissible, but that it did not prejudice the appellant in any way. As to the amount of the award, we are inclined to respect the judgment of the trial court.

The twentieth error assigned is that the defendant was not permitted to ask plaintiff Angel Cabán Santiago whether he had filed income tax returns. This question, according to the defendant, was made for the purpose of impeaching the veracity of the witness. The plaintiff testi- fied that the truck produced $325 gross and about $140 net per month. He also said that he is married, that he has two children, that that he was unemployed during the four months he was deprived of the use of his truck, and that only his family helped him. This being the case he was not obliged to file income tax returns because according to the law, only persons having a net income for the tax year of $2,500 or more, if married and living with their spouses, must file a statement under oath showing specifically the items of their gross income, and the deductions and credits allowed. Act

No. 74 of August 6, 1925 (Session Laws, p. 401, section 24). According to the evidence, Angel Cabán Santiago has a net income of less than $2,500. The ruling of the court refusing to permit the witness to be questioned as to whether he had filed income tax returns could not have prejudiced the defendant.

The twenty-first error assigned goes to the holding of the lower court that plaintiff Angel Cabán Santiago suffered damages amounting to $160 for the time he did not use his truck. The appellant argues that the evidence of the plaintiff himself shows that the truck was returned to him a month after he paid for the repairs. According to the testimony of plaintiff Angel Cabán Santiago, the car was in the garage a month before any repairs were made, because he was told that if he did not pay $100 the repairs could not be started; that he obtained this sum from his relatives and when he paid it the repairs were begun, and the truck was returned to him a month later. The court *a quo* awarded damages for two months at $80 a month. If Angel Cabán Santiago did not have money with which to pay the sum demanded of him in advance for the repairs to the truck, he cannot be responsible for the time which elapsed before the work was begun. It is true that the injured party should do everything possible to mitigate the damages which he has suffered, that is, he should do everything reasonably within his power to prevent the damages from increasing. A person cannot be asked, however, to anticipate damages to his property and to prepare to meet the expenses which he may incur in repairing such property. The plaintiff did what any reasonable man would have done under the same circumstances (17 C. J. 776), considering that he lived from the profits of his truck and that in order to obtain the $100 demanded of him he had to resort to his family. The error assigned must be dismissed.

The twenty-second error is based on the admission, over the objection of the defendant, of evidence as to the

medical treatment of and prescriptions for the plaintiff Angel Cabán Santiago. It deals with $25 paid for medical fees and $15 paid for medicine. The error assigned must be dismissed.

The twenty-third error consists in the award by the court to the plaintiff Angel Cabán Santiago of the sum of $300 as a reasonable compensation for his physical, mental and moral suffering. The appellant admits that the plaintiff suffered physically, but does not believe that a simple leg bruise can produce moral or mental suffering of any sort. The evidence, in its opinion, does not show that the plaintiff received any bodily injury of such nature as to worry him mentally or morally. The complaint alleges that the injuries received by the plaintiff caused him great pain and physical and moral suffering, and it was shown by the testimony of Dr. Cardona that Angel Cabán Santiago received bruises in the left knee, lacerations on the back of his right hand, and bruises in the chest, that at first these bruises seemed to be comparatively slight, but that the bruise on the left knee produced an inflammation of the bursa supratellaris and that the plaintiff who is from Camuy, returned to Aguadilla a week later because the inflammation of the knee, and it was necessary to keep the leg still and restrict the movements of the knee for about a month for the purpose of reducing the synovial inflammation; that it was necessary to apply a plaster cast, remove it and put it back again; that he came from Camuy three or four times; that a synovial effusion is painful; that it takes some days to develop because the inflammation comes slowly; that the plaintiff had blows on the right side of the chest on the external part of his right side, and the severe bruise on the knee; that he prescribed a sedative for the pain during the first few days, which is when it is strongest; that after he had treated the injured man he left for his home in Camuy and that he returned after a week with the inflammation of the knee. This is, in brief, the evidence contained in the testimony of Dr. Cardona.

There is no doubt that mental anguish may be considered as an element of damages when it is a direct and necessary consequence of the physical injury. *McDermott* v. *Severe,* 202 U.S. 600, 611. Some courts hold that it is difficult, if not impossible, to establish a dividing line between physical and mental suffering. *Baisdrenghien* v. *Missouri, etc. R. Co.,* 91 Kan. 730, 139 P. 428; *Western Union Tel. Co.* v. *Rogers,* 68 Miss. 748, 9 So. 823. Others consider the suffering as a mental emotion derived from the physical injury. "It is the mind," it has been said, "that either feels or takes cognizance of physical pain, and hence there is mental anguish or suffering inseparable from bodily injury, unless the mind is overpowered and consciousness is destroyed." The *I. & St. L. R. R. Co.* v. *Stables,* 62 Ill. 313, 320. In this case it is not necessary that we fix the rule to be followed because the lower court has granted $300 damages, which is not excessive, according to the evidence presented, even discarding the mental suffering. For these reasons we believe that we must accept the award made by the trial court in its judgment.

Lastly, the appellant alleges that the lower court erred in ordering it to pay costs, expenses and attorney's fees. We are of the opinion that we must accept the ruling of the court *a quo* in the exercise of its discretional powers.

The judgment appealed from must be affirmed.

Mr. Justice Travieso took no part in the decision of this case.